UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 07-114-KSF

HEARTWOOD, INC. and KENTUCKY
HEARTWOOD, INC.                                                                PLAINTIFFS

v.                                    **OPINION & ORDER**

THOMAS A. PETERSON, Acting Regional
Forester, and UNITED STATES FOREST
SERVICE                                                                        DEFENDANTS

\* \* \* \* \* \* \* \* \* \*

Currently before the Court are several motions filed by the plaintiffs in this action, Heartwood, Inc. and Kentucky Heartwood, Inc. (collectively "Heartwood"), including Heartwood's motion for preliminary injunction [DE #29], which is fully briefed and ripe for review. Also before the Court are Heartwood's unopposed motion for leave to file its Second Amended Complaint [DE #28], Heartwood's opposed motion to compel the filing of additional documentation [DE #35], and Heartwood's unopposed motion for leave to exceed the page limit for its reply memorandum [DE # 36]. All of these motions are addressed below.

I.   **INTRODUCTION**

Heartwood filed this civil action for declaratory judgment and injunctive relief challenging the actions of the defendants, Thomas A. Peterson, Acting Regional Forester[1], and the United States Forest Service, (collectively the "USFS") in approving the 2003 Ice Storm Project and the revised

---

[1]Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Regional Forester Thomas A. Peterson is substituted for his predecessor Charles L. Myers.

Forest Plan for the Daniel Boone National Forest ("DBNF").  Heartwood's First Amended Complaint, filed on June 20, 2007, makes the following allegations.  First, Heartwood alleges that the 2003 Ice Storm Recovery Project (the "Project") was approved without preparation of an Environmental Impact Statement ("EIS") or an adequate Environmental Assessment ("EA") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq.*, and NEPA's implementing regulations and was approved in violation of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, the Administrative Procedures Act ("APA"), 5 U.S.C. § 550 *et seq.*, and the APA's implementing regulations.  Second, Heartwood alleges that the recently adopted Daniel Boone National Forest Plan fails to meet the minimally required elements of forest-wide management in violation of NEPA and NFMA.  Finally, Heartwood alleges that the Daniel Boone National Forest Plan and the Ice Storm Recovery Project violate the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.

Upon receipt of the defendants' answer to the First Amended Complaint and the report of the parties Rule 26(f) Planning Meeting, a scheduling order was issued requiring the parties to submit motions for judgment. [DE #20]  Prior to the deadline for the filing of Heartwood's motion for judgment, Heartwood filed its motion to suspend the briefing schedule for the purpose of permitting Heartwood to file a Second Amended Complaint and a motion for preliminary injunction following the conclusion of a sixty (60) day Notice Period under the ESA, which commenced on February 1, 2008.  The basis of Heartwood's motion was the allegation that a new threat to the survival of the Indiana bat, an endangered species under the Endangered Species Act, was identified and that a preliminary injunction will be necessary to halt any killing of Indiana bats in the DBNF. [DE #24]  Heartwood's motion was granted on March 10, 2008, and the Court ordered Heartwood to file either a status report or a motion for leave to file a Second Amended Complaint on or before

April 1, 2008. [DE #26] On April 1, 2008, Heartwood filed its status report, indicating that the sixty day period would expire on April 4, 2008 and informed the Court that a motion for leave to file a Second Amended Complaint would be filed then. [DE #27]

On April 4, 2008, Heartwood filed its motion for leave to file its Second Amended Complaint [DE #28], as well as a motion for preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. [DE #29]  Pursuant to its motion for preliminary injunction, Heartwood argues that new evidence related to an endangered species - the Indiana bat - requires an injunction prohibiting the USFS from the following:

(1) taking any action to implement the 2003 Ice Storm Recovery Project;

(2) taking any action to implement any (including on-going) timber sales on the Daniel Boone National Forest; and

(3) taking any action to allow human access to any known Indiana bat hibernaculum on the Daniel Boone National Forest, with the exception of access for research purposes.

Heartwood now contends that the USFS's failure to re-enter into formal consultation with the United States Fish and Wildlife Service ("FWS"), and the USFS's failure to stop projects that could harm and kill the Indiana bat, violate the Endangered Species Act.

II.     **RELEVANT STATUTORY AND REGULATORY BACKGROUND**

As indicated by its name, the Endangered Species Act, or ESA, was enacted in 1973 "to protect and conserve endangered and threatened species and their habitats." *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518, 2526 (2007).  The key term in the ESA - "conservation" - means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary. . . . " 16 U.S.C. § 1532(3).  In short, the ESA attempts to insure the continued existence of endangered and threatened species.

The ESA mandates that Federal agencies place conservation above any of the agency's competing interests. The United States Supreme Court examined this conservation requirement in *Tennessee Valley Authority v. Hall*, 437 U.S. 153 (1978):

> The plain intent of Congress in enacting this statute [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost . . .[T]he legislative history undergirding § 7 [requiring interagency consultation, discussed below] reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies. . .
> . . . [T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable."

*Id*. at 184-85, 187; *see also* 16 U.S.C. § 1531(c)(1)("[A]ll Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purpose of this chapter").

With conservation as its goal, the ESA provides a procedural framework for Federal agencies to analyze whether any proposed action "may affect" listed species or critical habitat. Under Section 7(a)(2) of the ESA, each federal agency must, in consultation with FWS (or the National Marine Fisheries Service, depending on the species at issue) insure that "any action authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the designated "critical habitat" of the species. 16 U.S.C. § 1536(a)(2). The ESA and its implementing regulations outline the consultation process for determining the biological impact of a proposed activity. 16 U.S.C. § 1536; 50 C.F.R. Part 402.

Generally, an agency proposing an action must first determine whether the action "may affect" listed species. 50 C.F.R. § 402.14(a). How this determination is made is left up to the

agency. If an agency determines that its action "may affect" a protected species or its habitat, then that agency must enter into consultation with the FWS to ensure that the proposed actions are not likely to jeopardize the continued existence of any listed species. *Id*. at § 402.14. The purpose of the consultation requirements of the ESA is to allow an agency to avail itself of "the expertise of Fish & Wildlife in assessing the impact of the proposed project and the feasibility of adopting reasonable alternatives." *Lone Rock Timber Co. v. United States Dep't of Interior*, 842 F.Supp. 433, 440 (D.Or. 1994). On the other hand, if the agency determines that its action will have "no effect" on protected species, then consultation is not required unless the director of FWS specifically requests consultation with the agency. 50 C.F.R. § 402.14(a)(b).

There are two forms of consultation: formal and informal. The agency may either enter into formal consultation with FWS or engage in informal consultation to determine whether formal consultation is appropriate or necessary. *Id*. at §§ 402.13, 402.14(a), (b). Informal consultation generally consists of discussions and correspondence between the agency and FWS. *Id*. at § 402.13(a). If during informal consultation the agency determines and FWS concurs in writing that the proposed action is "not likely to adversely affect" a protected species, then the consultation process is complete and formal consultation is unnecessary. *Id*. If, on the other hand, during informal consultation the agency determines that its actions "may affect" listed species, then the agency must request initiation of formal consultation with FWS. *Id*. at § 402.14(a).

As a part of the formal consultation process, FWS will issue a "biological opinion" detailing its biological conclusions on how the proposed action will affect the listed species, including a conclusion as to whether the proposed action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(A). If FWS determines that the proposed action - whether standing alone or as modified

by a reasonable and prudent alternative - is not likely to jeopardize the species, but may result in the incidental "take" of members of the species, it provides an "incidental take statement" ("ITS") along with the biological opinion. 16 U.S.C. § 1536(b)(4)(C)(i)-(ii). The ITS must specify the impact of the incidental taking on the species and specify those reasonable and prudent measures that FWS considers "necessary or appropriate to minimize such impact . . .," as well as the terms and conditions by which such measures will be accomplished. *Id*. "[A]ny taking that is in compliance with the terms and conditions specified in a written [ITS] . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

Importantly, this consultation obligation is on-going and continuing. *Id*. at § 402.16. Reinitiation of formal consultation is required and shall be requested by the agency or by FWS where discretionary federal involvement or control over the action has been retained or is authorized by law and:

> (a) if the amount or extent of taking specified in the incidental take statement is exceeded;
>
> (b) if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
>
> (c) if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or
>
> (d) if a new species is listed or critical habitat designated that may be affected by the identified action.

*Id*. at § 402.16. Either FWS or the action agency may request initiation, but the final decision is made by the action agency. *Id*.; 50 C.F.R. § 402.14(a); *Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005). Like any agency action, this decision may be reversed by a court only if it is arbitrary, capricious, or otherwise contrary to law. "[T]he standard for demonstrating that an

agency was arbitrary and capricious in failing to reinitiate consultation is an exacting one." *Hawksbill Sea Turtle v. FEMA*, 11 F.Supp.2nd 529, 550 (D.V.I. 1998).

**III.    FACTUAL AND PROCEDURAL BACKGROUND**

At issue in this case is the Indiana Bat, or *myotis sodalis*, an endangered species under the ESA. The Indiana Bat is a medium-sized bat first listed as an endangered species under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926, 16 U.S.C. 668aa(c)). It is currently included as an endangered species under the ESA. The Indiana bat, typically less than 2 inches in length, is an insectivorous nocturnal mammal capable of true flight. The Indiana bat lives primarily in eastern United States and is known to be present in several cave systems within the Daniel Boone National Forest. The bats feed in the forest on local insect populations in the fall before hibernation in the caves. Starting in mid-April, female bats begin to emerge from the hibernaculum for migration to their summer roost sites, followed by the male bats. Although the bats mate before hibernation, fertilization is delayed until the female bats emerge. Pregnant bats form "maternity colonies" in roost trees, where they give birth and collectively raise their young. The bats prefer to roost in tree cavities, beneath exfoliating and/or sloughing bark, and within standing dead trees throughout the summer, and continue to forage locally during this time. Because the trees are habitable for only a few breeding seasons, Indiana bats frequently relocate year to year.

Heartwood contends that based on a recent outbreak of a fungal ailment known as "White Nose Syndrome," the USFS must be enjoined from continuing with the Ice Storm Recovery Project and other activities associated with timber harvest and Indiana bat habitat. WNS was first observed in the winter of 2006-2007. It is characterized by the white fungus on the noses of many affected bats. *See* www.fws.gov/northeast/pdf/white-nosefaqs.pdf. The cause of WNS is unknown and its unclear whether the fungal infections that results in the characteristic white nose is the cause or a

symptom of the disease. WNS has been documented in caves in New York, Vermont, Massachusetts and Connecticut. *Id*. There is no evidence that WNS has been detected in Kentucky or any adjoining states, or that any Indiana bats migrate between the DBNF and areas presently affected by WNS. *See* Dec. of Dennis L. Krusac, ¶ 19; AR B83. Although the FWS's website, www.fws.gov indicates that there is a concern about the viability of Indiana bats in the Northeast, there is no reference to any concern about WNS in Kentucky or surrounding states.

The DBNF, which encompasses close to 690,000 acres, includes some critical habitat for the Indiana bats. In February 2003, a major ice storm uprooted and destroyed trees on over 25,000 acres within the DBNF. As a result, the forest was exposed to threats, including the infiltration of non-native species and invasive diseases, and significant wildlife habitat was damaged or destroyed. Therefore, the USFS developed a three part project, the 2003 Ice Storm Recovery Project, designed to functionally restore the area to its previous condition, prepare the area for future disturbance events, and address new threats resulting from the changes wrought by the storm. Specifically, the Ice Storm Recovery Project involves (1) cutting of severely damaged and downed trees on 12,859 acres, of which one-third, or 4,485 acres, would involve removal of the cut trees in commercial timber harvest; (2) control of non-native invasive plants on 1,000 acres by digging up and removing them and by selectively applying herbicide; and (3) restoration of 35 woodland ponds that had served the bat habitat before the storm.

In February 2005, the USFS initiated formal consultation with the FWS in order to ensure that implementation of the Ice Storm Recovery Project would not result in jeopardy to the Indiana bat. AR B43. FWS issued its biological opinion in December 2005 and it determined that implementation of the Ice Storm Recovery Project was not likely to jeopardize the continued existence of the Indiana bat. AR B44. Specifically, FWS concluded that the project would be

conducted in a manner such that "suitable roosting habitat is retained within the salvage/sanitation project areas and is generally not considered to be a limiting factor for the Indiana Bat on the DBNF." AR B44 at 54-55. FWS further noted that "the [Morehead Ranger District] or DBNF has no known occurrence of taking an Indiana bat during tree felling or associated operations." *Id*. at 55.

The 2005 biological opinion did, however, include an Incidental Take Statement, or ITS, regarding the Indiana bat. The ITS notes that incidental takings of the Indiana bat are difficult to detect and therefore based the level of incidental take on the acreage that will be affected by the Ice Storm Recovery Project for six years from project implementation. The ITS states that "the level of incidental take authorized by the biological opinion is 4,704 acres of commercial removal of damaged trees and restoration and creation of bat habitat when accomplished during the summer roosting period of the Indiana bat (April 1 to September 15)." *Id*. at 60. The ITS further notes that "re-initiation of consultation on this action may be necessary, because there is little specific information on the amount of incidental take, other than the acreage of the proposed action, that is likely to occur as a result of the action." *Id*. at 61. Furthermore, due to the lack of specific information on the amount of incidental take, FWS included two mandatory "Reasonable and Prudent Measures" which the USFS must comply with, namely:

> (1) The USFS must plan, evaluate, and implement the proposed management activities associated with the [Ice Storm Recovery Project] in a manner that is consistent with the Standards contained in the 2004 Forest Plan to protect the Indiana bat. Specific implementation of the measures designed to maintain, improve, or enhance habitat for Indiana bats will help avoid impacts to Indiana bats and their habitat and minimize incidental take of Indiana bats associated with the [Ice Storm Recovery Project]; and
>
> (2) The USFS must monitor its activities associated with the [Ice Storm Recovery Project] to determine if the 2004 Forest Plan Standards and

> the Terms and Conditions of this biological opinion are being implemented and provide an annual report of those activities to the Service.

*Id*. at 62.  The biological opinion further provides that the USFS must comply with detailed, mandatory "Terms and Conditions" designed to minimize the impact of the incidental take of Indiana bats.  *Id*. at 65.  Finally, in setting forth the USFS's obligation to reinitiate formal consultation contained in 50 C.F.R. § 402.16, the ITS states as follows:

> [R]e-initiation of formal consultation is required where discretionary [Morehead Ranger District] involvement or control over the action has been retained (or is authorized by law) and if: . . . (B) new information reveals effects of the USFS's action that may affect listed species or critical habitat in a manner or to an extent not considered in this consultation (e.g., range-wide monitoring shows, over a five-year period, a decline in hibernating Indiana bats). . . .

*Id*. at 66.

Following issuance of the biological opinion for the Ice Storm Recovery Project, Heartwood filed an administrative appeal of the decision to proceed with the Project.  Although this appeal was denied, the appeal officer added a mitigation measure to the project implementation, which requires that during bat maternity season, trees may only be cut if the area is surveyed and no female bats are found.  AR B75, B76.  This period, from May 1 until July 31, is when young bats are unable to fly.  AR B76.

The Forest Service began implementation of the Ice Storm Recovery Project on September 28, 2006.  AR B87.  Although as of April 2008, timber harvest has occurred on 101 acres within the project area, only 14 acres of Indiana bat habitat - or 0.3% of the amount authorized by the ITS - have been altered.  *See* Dec. of Michael Kleumpke,¶ 2.  The Forest Service currently has only 512 acres under contract for timber harvest.  *Id*.

Based on the recent reports of WNS in the Northeast, the USFS undertook a review of the

Ice Storm Recovery Project to determine whether reinitiation of consultation with FWS was necessary. AR B83. The USFS concluded that reinitiation was not necessary for the following reasons: (1) the Ice Storm Project has disturbed much less Indiana bat habitat than was anticipated and authorized by the 2005 biological opinion; (2) no new effects of the Project are anticipated on Indiana bats; (3) the Project actions are "minimal across the landscape;" (4) entry to all know hibernacula within the DBNF is restricted; and (5) no occurrence of WNS has been observed within DBNF or even within 700 miles of the forest. AR B83 at 3-4, 8, 10. Dec. of Richard P. Braun, ¶ 3, Atts. A-B. The USFS states that it will revisit this determination, however, if there are any reports of WNS within Kentucky and that it is currently monitoring WNS and is prepared to take action if WNS becomes a threat to bats in DBNF. AR B83 at 11.

## IV. STANDARD OF REVIEW

### A. PRELIMINARY INJUNCTION STANDARD

As the Court has previously noted, "[a] preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *ACLU v. Mercer County, Kentucky*, 219 F. Supp.2d 777, 781 (E.D. Ky. 2002). The Sixth Circuit traditionally relies on the four factor balancing test when considering whether to grant a motion for a preliminary injunction. The four factors are as follows:

(1) the likelihood of the plaintiff's success on the merits;

(2) whether the injunction will save the plaintiff from irreparable injury;

(3) whether the injunction would harm others; and

(4) whether the public interest would be served.

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995) (citations omitted). Heartwood, however, argues that the four-factor test for preliminary relief is not applicable in ESA cases, instead arguing that injunctive relief must issue as a matter of course if the Court determines that a violation of the ESA has occurred. Heartwood relies on this Court's previous ruling in *Kentucky Heartwood, Inc. v. Worthington*, 20 F.Supp.2d 1076, 1094 (E.D.Ky. 1998), in which this Court held that "[w]hen the ESA is involved in actions wherein injunctive relief is requested, courts are not bound to use the traditional equitable 'balancing of harms' analysis." *See also Kentucky Heartwood, Inc. v. Worthington*, 125 F.Supp.2d 839 842 (E.D.Ky 2000). In both of these previous Heartwood cases, the Court concluded that injunctive relief was appropriate only after a finding that the USFS failed to engage in *any* consultation under the ESA and arguably was in clear violation of its ESA duties. That is not the case here, however. In fact, the USFS has fully complied with its consultation obligations under the ESA in implementing the Ice Storm Recovery Project, including obtaining a biological opinion from FWS that ensures that the Project will not jeopardize the Indiana bat or any other listed species. The only issue now is whether consultation should be reinitiated based on the WNS outbreak in the Northeast. For the reasons set forth below, the Court concludes that Heartwood is not likely to succeed in establishing an ESA violation and therefore the Court will utilize the traditional four-part balancing test for determining whether preliminary injunctive relief is appropriate in this case.

This would be consistent with the approach by other circuits which have chosen to use the "traditional balancing of harms analysis" in the ESA context. *See Water Keeper Alliance v. U. S. Department of Defense*, 271 F.3d 21, 34-35 (1st Cir. 2001); *Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 478 n.13 (3rd Cir. 1997); *Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 1986); *see also Buckeye Forest Council v. U. S. Forest Service*, 337 F.Supp.2d 1030, 1035 (S.D.

Ohio 2004); *Alabama v. U. S. Army Corps of Engineers*, 441 F.Supp.2d 1123, 1131-32 (N.D. Ala. 2006).[2]

### B. REVIEW OF ADMINISTRATIVE AGENCY ACTION

The Administrative Procedure Act prescribes the standard and scope by which a Federal District Court is to review a challenge to a final agency action under statutes like the ESA with no internal standard of review. In reviewing decisions of federal defendants, this Court employs the narrow "arbitrary and capricious" standard of review. 5 U.S.C. § 702 *et seq.* Specifically, the Court must determine whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The Court must determine whether the defendants' "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and therefore, was arbitrary and capricious. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *abrogated on other grounds, Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 506 (6th Cir. 1995). The Court is not empowered to substitute its judgment for that of the agency. *Id.*

### V. HEARTWOOD'S MOTION FOR PRELIMINARY INJUNCTION

#### A. LIKELIHOOD OF SUCCESS ON THE MERITS

##### 1. RE-INITIATION OF FORMAL CONSULTATION

In support of its motion for preliminary injunction, Heartwood first argues that based on the

---

[2] The Ninth Circuit Court of Appeals, in *National Wildlife Federation v. Burlington N.R.R.*, 23 F.3d 1508 (9th Cir. 1994), applied a "modified" standard for ESA cases seeking injunctive relief, the Ninth Circuit requires that a plaintiff demonstrate either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips in its favor. *Id.* at 1510.

recent emergence of WNS in the Northeast, the USFS must reinitiate consultation with FWS. As explained above, an agency is only required to reinitiate consultation with FWS if one of the four factors set forth in 50 C.F.R. § 402.16 applies. In this case, Heartwood points only to factor (b), which requires an agency to reinitiate if "new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).

In this case, the new information - an outbreak of WNS in the Northeast - does not mandate reinitiation of consultation with FWS. As the Ninth Circuit has stated, "[w]e do not hold that every modification of or uncertainty in a complex and lengthy project requires the agency to stop and reinitiate consultation." *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987). Rather, the Ninth Circuit concluded that reinitiation was required only (1) because the expert agency, FWS, had requested reinitiation, and (2) because a land transfer upon which the biological opinion had relied had fallen apart. This land transfer was "the most important of many modifications the FWS considered absolutely necessary to insure that the project was not likely to jeopardize [bird species'] continued existence." *Id*.

Despite a duty in the regulations to speak up if the need for reintitiation arises, FWS has not requested reinitiation of consultation in this case. *See Wyoming Outdoor Council v. Bosworth*, 284 F.Supp.2d 81, 95 (D.D.C. 2003) ("[g]iven its independent duty to request initiation when warranted, the FWS will presumably speak up if conditions requiring reinitiation arise"). The administrative record reveals that the USFS, FWS, and other agencies are currently monitoring the impact of WNS on bat species, including the Indiana bat. AR A58 at 1; Krusac Dec. ¶23. Nothing in the record, however, reveals any impact associated with WNS within the DBNF or within the Ice Storm Recovery Project. In fact, the USFS reports a rangewide increase of 9.4% and a Kentucky-wide

increase of 8.6% in Indiana bat populations from 2005 to 2007. AR B 83 at 4. Moreover, there is no evidence that any Indiana bats have migrated between Kentucky and areas currently infected with WNS. *Id*. Although Heartwood speculates that WNS may impact Indiana bats in the DBNF, the record demonstrates that the Forest Service has fully considered the impacts of WNS as they are known at this time and has made a reasonable decision, based on expert advice, not to reinitiate consultation at this time. AR B83. Accordingly, the Court finds that Heartwood is not likely to succeed on the merits of its ESA claim based on alleged duty to reinitate formal consultation due to WNS.

### 2. DUTY TO CONSERVE

Next, the Court must consider whether Heartwood is likely to succeed on its claim that the USFS has violated its alleged "duty to conserve" the Indiana bat. Based on the threat posed to the survival of the Indiana bat arising from WNS, Heartwood contends that the ESA's "duty to conserve" mandates that the Forest Service cease any action to implement the 2003 Ice Storm Recovery Project, cease taking any action to implement any (including on-going) timber sales in DBNF, and cease taking any action to allow human access to any known Indiana bat hibernaculum on the DBNF, with the exception of access for research purposes. In support of this argument, Heartwood relies on this Court's decision in *House v. U. S. Forest Service*, 974 F.Supp. 1022 1028 (E.D.Ky. 1997), holding that the ESA directs Federal agencies "to afford first priority" to the conservation of the listed species. *See also Tennessee Valley Authority*, 437 U.S. at 184-186. By proceeding with the 2003 Ice Storm Recovery Project, Heartwood contends that the Forest Service is placing the sale of timber before the protection of the Indiana bat.

*House*, however, is clearly distinguishable from this case. In *House*, the Court enjoined the

USFS from proceeding with a timber sale that would adversely affect the Indiana bat because the USFS failed to formally consult with FWS; the timber sale was inconsistent with the Forest Plan in effect at the time, which prohibited "all adverse impacts on" the Indiana bat; and the sale threatened to take Indiana bats without an ITS and in violation of the ESA. *House*, 974 F.Supp. at 1027-1032.

The USFS in the present case, however, fully complied with the procedural framework outlined by the ESA by entering into formal consultation with FWS, by complying with the terms and conditions of the ITS, and by evaluating and monitoring the threat posed by WNS. The USFS has thus satisfied its duty to conserve the Indiana bat under the ESA. Accordingly, Heartwood is not likely to succeed on this claim.

**B.     IRREPARABLE INJURY**

Heartwood contends that the Indiana bat will be irreparably harmed if the USFS is allowed to continue with the Ice Storm Recovery Project and other activities affecting the Indiana bat. However, "[i]n order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again. *Michigan Coal of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Harm is irreparable only if it is "certain and immediate;" it cannot be based on injuries that are "speculative or theoretical." *Id.* Heartwood cannot meet this burden.

The 2005 biological opinion from FWS concluded that the Ice Storm Project would not jeopardize the Indiana bat. AR B44. The new evidence relied upon by Heartwood - the outbreak of WNS in the Northeast - does not establish that Indiana bats in the DBNF will suffer certain and immediate harm. In fact, the record reveals that Kentucky has not been affected by WNS, and in fact, the Indiana bat population in Kentucky is on the rise. AR B83 at 4. Although it is possible that

an outbreak of WNS may occur at some future date in Kentucky, at this point the alleged harm is merely speculative and theoretical. Thus, Heartwood cannot show any irreparable harm as required by the balancing test.

### C. HARM TO OTHERS AND THE PUBLIC INTEREST

The remaining factors in the four-factor balancing test weigh against granting the requested injunctive relief. First, enjoining the Ice Storm Recovery Project would unnecessarily threaten the overall health of the forest, including those portions of the forest that service the Indiana bats. Second, granting the requested injunctive relief would result in monetary harm to the government in the form of indemnifying timber contractors for expenses incurred as a result of the injunction. *See* Kleumpke Dec., ¶¶ 5-11. Finally, because the USFS has fully complied with the ESA, any preliminary injunction is unjustified and unnecessary to insure the conservation of the Indiana bat.

### D. CONCLUSION

Because Heartwood is not likely to succeed on its ESA claims, application of the four-part balancing test is appropriate in this case. Weighing all four factors, it is clear that Heartwood is not entitled to the requested preliminary injunctive relief. Accordingly, Heartwood's motion for preliminary injunction will be denied.

### VI. HEARTWOOD'S REMAINING MOTIONS

Because Heartwood's motion for leave to file a second amended complaint [DE #28] and motion for leave to exceed the page limitation for its reply memorandum [DE # 36] are unopposed, both of these motions will be granted.

The Court will deny Heartwood's motion to compel the USFS to supplement the record [DE #35] for the following reasons. The USFS filed its administrative record with the Court on

November 6, 2007. [DE # 19]  Thereafter, on April 8, 2008, the USFS filed its Supplemental Administrative Record [DE #31], on April 22, 2008 it filed its Second Supplemental Administrative Record [DE #32].  Heartwood responded by filing its response and motion to compel the filing of additional documents. [DE #35]  The USFS then filed, on May 5, 2008, its Third Supplemental Administrative Record [DE #37].  To the extent that the documents requested in Heartwood's motion have now been supplied, Heartwood's motion to compel is now moot.

In its motion, Heartwood also objects to the fact that documents in the Second Supplemental Administrative Record reveal that an Indiana bat was captured in the Ice Storm Recovery Project area.  However, this fact does not change the analysis relevant to Heartwood's motion for preliminary injunction because the FWS assumed that bats would be found and possibly "taken" in the project area.  AR B44.

Finally, Heartwood argues that the USFS illegally changed the ruling on their administrative appeal of the 2003 Ice Storm Recovery Project even though an Indiana bat had been captured in the Ice Storm Recovery Project area and then failed to notify Heartwood that the appeal decision had been changed.  Again, the capture of the Indiana bat is irrelevant to the analysis above.  Furthermore, whether or not the USFS fully complied with statutory and/or regulatory guidelines in issuing its administrative decision is outside the scope of this motion for preliminary injunction based on the ESA.  Therefore, this motion will be denied.

## VII.   CONCLUSION

For the reasons set forth above, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

(1) Heartwood's unopposed motion for leave to file a Second Amended Complaint [DE

#28 ] is **GRANTED**;

(2) Heartwood's motion for preliminary injunction [DE #29] is **DENIED**;

(3) Heartwood's motion to compel [DE #35] is **DENIED**; and

(4) Heartwood's motion for leave to exceed page limit for reply memorandum [DE #36] is **GRANTED**, and the Clerk is directed to **FILE** Heartwood's tendered reply memorandum.

This May 21, 2008.

Signed By:
*Karl S. Forester* KSF
**United States Senior Judge**