UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON


CIVIL ACTION NO. 07-114-KSF

HEARTWOOD, INC. and KENTUCKY
HEARTWOOD, INC.                                                          PLAINTIFFS


v.                                    **OPINION & ORDER**


ELIZABETH L. AGPAOA, Regional
Forester, and UNITED STATES FOREST
SERVICE                                                                DEFENDANTS

* * * * * * * * * *

Currently before the Court are several motions filed by the plaintiffs, including their motion

for judgment reversing the administrative decisions, which is fully briefed and ripe for review.  DE

#49.  Also before the Court are the plaintiffs' motion for leave to file its Third Amended Complaint

and motion for leave to file supplemental information.  DE ##51, 67.  These motions are addressed

below.

## I.     INTRODUCTION

Heartwood, Inc., is a not-for-profit corporation organized under the laws of Indiana.  It is

active in the protection of forests and native species of the eastern United States, including the

Daniel Boone National Forest in Kentucky.  Kentucky Heartwood, Inc. is also a not-for-profit

corporation organized under the laws of Kentucky which maintains a strong interest in the protection

of biodiversity and native species in the Daniel Boone National Forest.  Heartwood, Inc. and

Kentucky Heartwood, Inc. (collectively "Heartwood") filed this civil action for declaratory judgment

1

and injunctive relief on April 25, 2007, challenging the actions of the defendants, Elizabeth L. Agpaoa, Regional Forester,[1] and the United States Forest Service (collectively the "Forest Service"), in approving the 2003 Ice Storm Project and the revised Forest Plan for the Daniel Boone National Forest ("DBNF").  DE #1.  Heartwood subsequently filed a First Amended Complaint and a Second Amended Complaint.  DE ##11, 43.  On May 21, 2008, the Court denied Heartwood's motion for preliminary injunction.  DE #40.  Currently before the Court is Heartwood's motion for leave to file its Third Amended Complaint. DE # 51.

This Third Amended Complaint makes the following allegations.  First, Heartwood alleges that the 2003 Ice Storm Recovery Project was approved without preparation of an Environmental Impact Statement ("EIS") or an adequate Environmental Assessment ("EA") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq*., and NEPA's implementing regulations, and was approved in violation of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, the Administrative Procedures Act ("APA"), 5 U.S.C. § 550 *et seq.*, and the APA's implementing regulations.  Second, Heartwood alleges that the recently adopted DBNF Revised Forest Plan fails to meet the minimally required elements of forest-wide management in violation of NEPA and NFMA.  Finally, Heartwood alleges that the DBNF Revised Forest Plan and the Ice Storm Recovery Project violate the Endangered Species Act, ("ESA"), 16 U.S.C. §§ 1531-1544.

---

[1]Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Elizabeth L. Agpaoa, Regional Forester is substituted for her predecessors, Thomas A. Peterson, Acting Regional Forester, and Charles L. Myers, Regional Forester.

II.　　RELEVANT STATUTORY AND REGULATORY BACKGROUND

　　　A.　　THE NATIONAL FOREST MANAGEMENT ACT

Congress enacted NFMA in 1976, emphasizing the concepts of "multiple use" and "sustained yield of products and services" and obligating the Forest Service to balance competing demands on national forests, including timber harvesting, recreational use, and environmental preservation. *Natural Resources Defense Council v. U.S. Forest Service*, 421 F.3d 797, 801 (9th Cir. 2005) (quotations and citations omitted).   The Forest Service manages each forest unit at two different levels: (1) the programmatic level, and (2) the project, or site-specific, level. *Colo. Envtl. Coal v. Dombeck*, 185 F.3d 1162, 1167-68 (10th Cir. 1999).  At the programmatic level, the Forest Service must develop land and resource management plans, commonly known as Forest Plans, for each unit of the National Forest System.  16 U.S.C. § 1604(a),(e), (g)(3)(B).  Because the Forest Service must account for a variety of different interests, each Forest Plan envisions the forest will be used for multiple purposes, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." *Id*. at § 1604(e)(1).  Additionally, the Forest Plan must provide for "diversity of plant and animal communities based on the suitability and capability of the specific land area." *Id*. at § 1604(g)(3)(B).

　　　Pursuant to NFMA, the Forest Service has promulgated regulations, or planning rules, applicable to developing and revising Forest Plans.  Both parties agree that the 2000 NFMA planning rules, codified at 36 C.F.R. § 219.10 (2000), apply to the DBNF Revised Forest Plan currently before the Court.  Pursuant to 36 C.F.R. § 219.10(g)(2000), Forest Plans are to be revised on a 10-15 year cycle.

3

When preparing or revising a Forest Plan, the Forest Service must produce a Draft Environmental Impact Statement ("DEIS") which must be circulated for public review and comment according to NEPA procedures. 36 C.F.R. §219.10(b) (2000). In the DEIS, the Forest Service must identify the agency's preferred alternative. *Id*. A Proposed Forest Plan that reflects the preferred alternative is also prepared and circulated along with the DEIS. *Id*.

After considering public comment on the DEIS and Proposed Forest Plan, the Forest Service may make any necessary changes and a Final EIS and Proposed Forest Plan is prepared for comment. *Id*. at 219.10(c). The Regional Forester then reviews the comments, the Final EIS and the Proposed Forest Plan and either approves or disapproves the Proposed Forest Plan. *Id*

The Forest Plan, then, is implemented at the project, or site-specific level, by approving or disapproving particular projects under NEPA using an environmental impact statement, an environmental assessment, or a categorical exclusion. All projects must comply with the Forest Plan. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006); *see* 16 U.S.C. § 1604(i).

### B.    THE NATIONAL ENVIRONMENTAL POLICY ACT

NEPA was promulgated, in part, to focus the attention of the government and the public on a proposed action, so that the consequences of the action can be studied before it is implemented. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989); *Michigan v. United States*, 994 F.2d 1197, 1199 (6th Cir. 1993) (holding that the purpose of NEPA is to ensure that federal agencies are aware of the environmental impact of their actions). While NEPA prescribes the necessary process by which federal agencies must take a hard look at the environmental consequences of a proposed course of action, it imposes no "substantive limits on agency conduct."

4

*See Friends of the Bow v. Thompson*, 124 F.3d 1210, 1213 (10th Cir. 1997)(citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 250 (1989)).

NEPA requires that before an agency may take "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), such as drafting or revising a Forest Plan, the agency must prepare an Environmental Impact Statement ("EIS"). *Id.* § 4332(2)(C);[2] *see*

---

[2]      Said statute provides in pertinent part that

all agencies of the Federal Government shall–
. . .
(C)  include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on–
    (I)      the environmental impact of the proposed action,
    (ii)     any adverse environmental effects which cannot be avoided should the proposal be implemented,
    (iii)    alternatives to the proposed action,
    (iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
    (v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).  Regarding the consideration of alternatives referred to in subsection (iii), 40 C.F.R. § 1502.14 requires the following:

**Alternatives including the proposed action.**
This section is the heart of the [EIS].  Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public.  In this section agencies shall:
    (a)      Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
    (b)      Devote substantial treatment to each alternative considered in

(continued...)

*also* 40 C.F.R. § §1502.3-1502.25.  An EIS contains the agency's consideration of the environmental

impacts of the proposed action and an evaluation of the "alternatives to the proposed action," *id*. at

§ 4332(2)(C)(iii), including the option of taking "no action," 40 C.F.R. § 1502.14(d).  However,

despite this mandate, if after a careful examination through an Environmental Assessment ("EA"),[3]

it is determined that the action would not be "significant," then an EIS is not necessary.  40 C.F.R.

§ 1508.13.  Thus, at the conclusion of the EA, the Forest Service prepares either a Finding of No

Significant Impact ("FONSI") or a Finding of Significant Impact and an EIS, *id.* § 1508.11.

---

[2](...continued)
|     |     |
|-----|-----|
|     | detail including the proposed action so that reviewers may evaluate their comparative merits. |
| (c) | Include reasonable alternatives not within the jurisdiction of the lead agency. |
| (d) | Include the alternative of no action. |
| (e) | Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference. |
| (f) | Include appropriate mitigation measures not already included in the proposed action or alternatives. |

40 C.F.R. § 1502.14.

[3]     "Environmental Assessment:
    (a)  Means a concise public document for which a Federal agency is
responsible that serves to:
    (1) Briefly provide sufficient evidence and analysis for determining
whether to prepare an environmental impact statement or a finding of no
significant impact.
    (2) Aid an agency's compliance with the Act when no environmental
impact statement is necessary.
    (3) Facilitate preparation of a statement when one is necessary.
    (b) Shall include brief discussion of the need for the proposal, of
alternatives . . . of the environmental impacts of the proposed action and
alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

Throughout this process, the "environmental information [collected must be made] available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

## C.    THE ENDANGERED SPECIES ACT

As indicated by its name, the Endangered Species Act, or ESA, was enacted in 1973 "to protect and conserve endangered and threatened species and their habitats." *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518, 2526 (2007). The key term in the ESA - "conservation" - means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary. . . . " 16 U.S.C. § 1532(3). In short, the ESA attempts to insure the continued existence of endangered and threatened species.

The ESA mandates that Federal agencies place conservation above any of the agency's competing interests. The United States Supreme Court examined this conservation requirement in *Tennessee Valley Authority v. Hall*, 437 U.S. 153 (1978):

> The plain intent of Congress in enacting this statute [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost . . .[T]he legislative history undergirding § 7 [requiring interagency consultation, discussed below] reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies. . .
> . . . [T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable."

*Id*. at 184-85, 187; *see also* 16 U.S.C. § 1531(c)(1)("[A]ll Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purpose of this chapter").

With conservation as its goal, the ESA provides a procedural framework for Federal agencies to analyze whether any proposed action "may affect" listed species or critical habitat.  Under Section 7(a)(2) of the ESA, each federal agency must, in consultation with the United States Fish and Wildlife Service ("FWS") (or the National Marine Fisheries Service, depending on the species at issue) insure that "any action authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the designated "critical habitat" of the species.  16 U.S.C. § 1536(a)(2).  The ESA and its implementing regulations outline the consultation process for determining the biological impact of a proposed activity.  *Id*. at § 1536; 50 C.F.R. Part 402.

Generally, an agency proposing an action must first determine whether the action "may affect" listed species.  50 C.F.R. § 402.14(a).  How this determination is made is left up to the agency.  If an agency determines that its action "may  affect" a protected species or its habitat, then that agency must enter into consultation with the FWS to ensure that the proposed actions are not likely to jeopardize the continued existence of any listed species.  *Id*. at § 402.14.  The purpose of the consultation requirements of the ESA is to allow an agency to avail itself of "the expertise of Fish & Wildlife in assessing the impact of the proposed project and the feasibility of adopting reasonable alternatives."  *Lone Rock Timber Co. v. United States Dep't of Interior*, 842 F.Supp. 433, 440 (D.Or. 1994).  On the other hand, if the agency determines that its action will have "no effect" on protected

8

species, then consultation is not required unless the director of FWS specifically requests consultation with the agency.  50 C.F.R. § 402.14(a)(b).

There are two forms of consultation: formal and informal.  The agency may either enter into formal consultation with FWS or engage in informal consultation to determine whether formal consultation is appropriate or necessary.  *Id*. at §§ 402.13, 402.14(a), (b).  Informal consultation generally consists of discussions and correspondence between the agency and FWS.  *Id*. at § 402.13(a).  If during informal consultation the agency determines and FWS concurs in writing that the proposed action is "not likely to adversely affect" a protected species, then the consultation process is complete and formal consultation is unnecessary.  *Id*.  If, on the other hand, during informal consultation the agency determines that its actions "may affect" listed species, then the agency must request initiation of formal consultation with FWS.  *Id*. at § 402.14(a).

As a part of the formal consultation process, FWS will issue a "biological opinion" detailing its biological conclusions on how the proposed action will affect the listed species, including a conclusion as to whether the proposed action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3)(A).  If FWS determines that the proposed action - whether standing alone or as modified by a reasonable and prudent alternative - is not likely to jeopardize the species, but may result in the incidental "take" of members of the species, it provides an "incidental take statement" ("ITS") along with the biological opinion.  *Id*. at § 1536(b)(4)(C)(I)-(ii).  The ITS must specify the impact of the incidental taking on the species and specify those reasonable and prudent measures that FWS considers "necessary or appropriate to minimize such impact . . .," as well as the terms and conditions by which such measures will be accomplished.  *Id*.  "[A]ny taking that is in compliance

9

with the terms and conditions specified in a written [ITS] . . . shall not be considered to be a prohibited taking of the species concerned." *Id*. at § 1536(o)(2).

Importantly, this consultation obligation is on-going and continuing. 50 C.F.R. § 402.16. Reinitiation of formal consultation is required and shall be requested by the agency or by FWS where discretionary federal involvement or control over the action has been retained or is authorized by law and:

(a)  if the amount or extent of taking specified in the incidental take statement is exceeded;

(b)  if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c)  if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d)  if a new species is listed or critical habitat designated that may be affected by the identified action.

*Id*. at § 402.16. Either FWS or the action agency may request reinitiation, but the final decision is made by the action agency. *Id*. Like any agency action, this decision may be reversed by a court only if it is arbitrary, capricious, or otherwise contrary to law. "[T]he standard for demonstrating that an agency was arbitrary and capricious in failing to reinitiate consultation is an exacting one." *Hawksbill Sea Turtle v. FEMA*, 11 F.Supp.2nd 529, 550 (D.V.I. 1998).

## III.   FACTUAL AND PROCEDURAL BACKGROUND

With this framework in mind, the Court now turns to the present case. Since its approval on September 27, 1985, the DBNF Forest Plan, along with its accompanying EIS, has been used as the primary document governing the management of the DBNF. Of course, the management of the

forest is also subject to the federal environmental laws discussed above:  the ESA, the NFMA, and the NEPA.

On June 21, 1996, the Forest Service published notice of its intent to prepare an EIS pursuant to NEPA for the purpose of revising its Forest Plan.  AR A5.  After the scoping period required by NEPA, the Notice of Availability of the DEIS and the Proposed Revised Forest Plan was published in the Federal Register on May 16, 2003.  AR A23.  The DEIS identified the following six alternatives, summarized below, which were considered in detail:

(1)     Alternative A: the no action alternative.  The Forest Service would continue to implement the DBNF's 1985 Forest Plan.

(2)     Alternative B-1: The natural interactions of organisms with each other and with their environment (ecological processes) would continue with a minimum of direct human influence.

(3)     Alternative C:  This Alternative would emphasize the maintenance and restoration of ecological processes and functions while providing for multiple public benefits.

(4)     Alternative C-1: The Preferred Alternative.  The Plan would emphasize the maintenance and restoration of ecological processes and functions while providing for multiple public benefits with added emphasis on recreation.

(5)     Alternative D: This Alternative would emphasize recreational opportunities to the extent possible.

(6)     Alternative E-1: This Alternative would emphasize the quality as well as the quantity of resource products to maximize benefits to local and regional communities.

AR A19, 21.  Additionally, the Forest Service considered two other alternatives, but not in detail. These alternatives are summarized below:

(1)     Alternative B: Under this Alternative there would be no human intervention in natural processes.

(2)     Alternative E: This Alternative "was originally developed to yield maximum return to the federal treasury from the production of timber and materials."

11

AR A19, 21.  The proposed Revised Forest Plan carries forward the Preferred Alternative, C-1.  AR A20a.  A period of public comment, including several open houses, concluded ninety days later. During the public comment period, Heartwood and others presented the Forest Service with two "no logging alternatives."  AR A26. Then, on April 14, 2004, the Forest Service issued its Final EIS and the Regional Forester signed the Record of Decision ("ROD") adopting the Revised Forest Plan, which adopts the Preferred Alternative, C-1.   AR A43, A38-A40, A47-A50.   Heartwood subsequently appealed the ROD and Revised Forest Plan, but the administrative appeal was denied by the Forest Service.  AR A57.

In February 2003, a major ice storm uprooted and destroyed trees on over 25,000 acres within the DBNF. AR B44 at 6.  As a result, the forest was exposed to threats, including the infiltration of non-native species and invasive diseases, and significant wildlife habitat was damaged or destroyed. Therefore, the Forest Service developed a three part project, the 2003 Ice Storm Recovery Project, designed to functionally restore the area to its previous condition, prepare the area for future disturbance events, and address new threats resulting from the changes wrought by the storm.  The Ice Storm Recovery Project involves the following: (1) cutting of severely damaged and downed trees on 12, 859 acres, of which one-third, or 4,845 acres, would involve removal of the cut trees in commercial timber harvest; (2) control of non-native invasive plants on 1,000 acres by digging up and removing them and by selectively applying herbicides; and (3) restoration of 35 woodland ponds that had served as bat habitat before the storm.  *Id.* at 6-11.  According to the Forest Service, the project will facilitate regrowth of trees that were not damaged in the storm as well as growth of new trees, and is an important measure to protect damaged forest stands from gypsy moth defoliation. AR B42 at 2.

Prior to implementing the Ice Storm Recovery Project, the Forest Service conducted an environmental analysis under NEPA to determine whether the project would significantly impact the environment.  As part of this analysis, the Forest Service, in February 2005, initiated formal consultation with the FWS in order to ensure that implementation of the Ice Storm Recovery Project would not result in jeopardy to the Indiana bat.  AR B43.  The Indiana Bat, or *myotis sodalis*, is a medium-sized bat first listed as an endangered species under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926, 16 U.S.C. § 668aa(c)).  It is currently included as an endangered species under the ESA.  The Indiana bat, typically less than 2 inches in length, is an insectivorous nocturnal mammal capable of true flight.   The Indiana bat lives primarily in the eastern United States and is known to be present in several cave systems within the Daniel Boone National Forest.  The bats feed in the forest on local insect populations in the fall before hibernation in the caves.  Starting in mid-April, female bats begin to emerge from the hibernaculum for migration to their summer roost sites, followed by the male bats.  Although the bats mate before hibernation, fertilization is delayed until the female bats emerge.  Pregnant bats form "maternity colonies" in roost trees, where they give birth and collectively raise their young.  The bats prefer to roost in tree cavities, beneath exfoliating and/or sloughing bark, and within standing dead trees throughout the summer, and continue to forage locally during this time.  Because the trees are habitable for only a few breeding seasons, Indiana bats frequently relocate year to year.

FWS issued its biological opinion in December 2005 and it determined that implementation of the Ice Storm Recovery Project was not likely to jeopardize the continued existence of the Indiana bat.  AR B44.  Specifically, FWS concluded that the project would be conducted in a manner such that "suitable roosting habitat is retained within the salvage/sanitation project areas and is generally

13

not considered to be a limiting factor for the Indiana Bat on the DBNF." AR B44 at 54-55. FWS further noted that "the [Morehead Ranger District] or DBNF has no known occurrence of taking an Indiana bat during tree felling or associated operations." *Id*. at 55.

The 2005 biological opinion did, however, include an Incidental Take Statement, or ITS, regarding the Indiana bat. The ITS notes that incidental takings of the Indiana bat are difficult to detect and therefore based the level of incidental take on the acreage that will be affected by the Ice Storm Recovery Project for six years from project implementation. The ITS states that "the level of incidental take authorized by the biological opinion is 4,704 acres of commercial removal of damaged trees and restoration and creation of bat habitat when accomplished during the summer roosting period of the Indiana bat (April 1 to September 15)." *Id*. at 60. The ITS further notes that "re-initiation of consultation on this action may be necessary, because there is little specific information on the amount of incidental take, other than the acreage of the proposed action, that is likely to occur as a result of the action." *Id*. at 61. Furthermore, due to the lack of specific information on the amount of incidental take, FWS included two mandatory "Reasonable and Prudent Measures" which the Forest Service must comply with, namely:

(1)     The [Forest Service] must plan, evaluate, and implement the proposed management activities associated with the [Ice Storm Recovery Project] in a manner that is consistent with the Standards contained in the 2004 Forest Plan to protect the Indiana bat. Specific implementation of the measures designed to maintain, improve, or enhance habitat for Indiana bats will help avoid impacts to Indiana bats and their habitat and minimize incidental take of Indiana bats associated with the [Ice Storm Recovery Project]; and

(2)     The [Forest Service] must monitor its activities associated with the [Ice Storm Recovery Project] to determine if the 2004 Forest Plan Standards and the Terms and Conditions of this biological opinion are

14

> being implemented and provide an annual report of those activities to
> the Service.

*Id*. at 62.  The biological opinion further provides that the Forest Service must comply with detailed,

mandatory "Terms and Conditions" designed to minimize the impact of the incidental take of Indiana

bats.   *Id*. at 65.   Finally, in setting forth the Forest Service's obligation to reinitiate formal

consultation contained in 50 C.F.R. § 402.16, the ITS states as follows:

> [R]e-initiation of formal consultation is required where discretionary [Morehead
> Ranger District] involvement or control over the action has been retained (or is
> authorized by law) and if: . . . (B) new information reveals effects of the [Forest
> Service]'s action that may affect listed species or critical habitat in a manner or to an
> extent not considered in this consultation (e.g., range-wide monitoring shows, over
> a five-year period, a decline in hibernating Indiana bats). . . .

*Id*. at 66.

Upon review of FWS's Biological Opinion and the other information and analysis contained

in the EA, the Forest Service approved the Ice Storm Recovery Project, issuing its Decision Notice

and Finding of No Significant Impact on February 2, 2006.   AR B61.   Heartwood filed an

administrative appeal of the decision to proceed with the Project.  AR B72.  Although this appeal

was denied, the Forest Service appeal officer added a mitigation measure to the project

implementation, which requires that during bat maternity season, trees may only be cut if the area

is surveyed and no female bats are found.  AR B74, B75.  This period, from May 1 until July 31, is

when young bats are unable to fly.  AR B76.

The Forest Service began implementation of the Ice Storm Recovery Project on September

28, 2006.  AR B87.  Although as of April 2008, timber harvest has occurred on 101 acres within the

project area, only 14 acres of Indiana bat habitat - or 0.3% of the amount authorized by the ITS -

have been altered.  DE#34-3,¶ 2.

15

Heartwood contends that based on a recent outbreak of a fungal ailment affecting bats known as "White Nose Syndrome," the Forest Service must reinitiate consultation with the FWS on the Revised Forest Plan and discontinue implementation of the Ice Storm Recovery Project and other activities associated with timber harvest and Indiana bat habitat.  WNS was first observed in the winter of 2006-2007.  It is characterized by the white fungus on the noses of many affected bats.  *See* www.fws.gov/northeast/pdf/white-nosefaqs.pdf.  The cause of WNS is unknown and its unclear whether the fungal infections that results in the characteristic white nose is the cause or a symptom of the disease.  WNS has been documented in caves in Connecticut, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Vermont, Virginia and West Virginia.  *Id*.  However, there is no evidence that WNS has been detected in Kentucky, or that any Indiana bats migrate between the DBNF and areas presently affected by WNS.  *See* DE #68-2*,* ¶ 12; AR B83.

Based on the reports of WNS in the Northeast, the Forest Service undertook a review of the Ice Storm Recovery Project to determine whether reinitiation of consultation with FWS was necessary.  AR B83.  The Forest Service concluded that reinitiation was not necessary for the following reasons:  (1) the Ice Storm Recovery Project has disturbed much less Indiana bat habitat than was anticipated and authorized by the 2005 biological opinion; (2) no new effects of the Project are anticipated on Indiana bats; (3) the Project actions are "minimal across the landscape;" (4) entry to all know hibernacula within the DBNF is restricted; and (5) no occurrence of WNS has been observed within DBNF or even within 700 miles of the forest.  AR B83 at 3-4, 8, 10, DE #34-2, ¶ 3, Atts. A-B.  The Forest Service states that it will revisit this determination, however, if there are any reports of WNS within Kentucky and that it is currently monitoring WNS and is prepared to take action if WNS becomes a threat to bats in DBNF.  AR B83 at 11.

16

IV.     STANDARD OF REVIEW

In reviewing the administrative decisions of the Forest Service, this Court employs the narrow "arbitrary and capricious" standard of review under the Administrative Procedure Act, 5 U.S.C. §702 *et seq.*[4]   The Court, limited solely to review what is contained in the administrative record,[5] must determine whether the defendant's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and therefore, was arbitrary and capricious. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)*; Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 506 (6th Cir. 1995).

The Court is not empowered to substitute its judgment for that of the agency. *Id.*  With that rule of law in mind, the Court does not seek to be a "Super Forest Service" – the Court cannot replace its judgment for that of the agency, and need only determine whether the agency has adequately reviewed the issue and taken a "hard look" at the environmental impact of its decision. *Neighbors Organized to Insure a Sound Env't, Inc. v. McArtor*, 878 F.2d 174, 178 (6th Cir. 1989).

However, the Court must act as a check on administrative decisions.  The Sixth Circuit eloquently explained the Court's role in cases such as the one at bar as follows:

> While it is generally accepted that federal agencies are entitled to a presumption of good faith and regularity in arriving at their decision, that presumption is not irrebuttable.  [This Court] would be abdicating [its] Constitutional role were [it] simply to "rubber stamp" this complex agency decision rather than ensuring that such decision is in accord with clear congressional mandates.  It is [the Court's] role to see that important legislative purposes are not lost or misdirected in the vast hallways of

---

[4]Specifically, the Court must determine whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. §706(2)(A).

[5]*Florida Power and Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (reviewing courts are limited to the administrative record).

the federal bureaucracy.  Specifically, [the Court must] decide whether the Forest Service took a hard look at the relevant factors and reached a decision that was neither arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

*Sierra Club v. Thomas*, 105 F.3d 248, 250 (6th Cir. 1997), *vacated on other grounds by Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998).

## V.      ANALYSIS

### A.      MOTION TO AMEND AND MOTION TO SUPPLEMENT

Heartwood has filed a motion for leave to amend its complaint and tendered a Third Amended Complaint.  DE #51.  The Forest Service does not oppose Heartwood's motion for leave to amend.  Accordingly, based on Rule 15(a)(2)'s rule of leniency, the Court will grant Heartwood's motion for leave to file a Third Amended Complaint.  *See* Fed.R.Civ.P. 15(a)(2).

Heartwood has also filed a motion for leave to file supplemental information.  DE #67.  The Forest Service has not objected or responded to Heartwood's motion, and in fact, has filed its own supplements to the record.  The Court will grant Heartwood's motion, and consider both parties' supplements to the record, only to the extent the supplemental information has been considered by the Forest Service with respect to its alleged duty to reinitiate consultation with the FWS.

### B.      THE  FOREST  SERVICE  CONSIDERED  AN  ADEQUATE RANGE OF ALTERNATIVES

In its motion for judgment, Heartwood first argues that the Forest Service failed to consider an adequate range of alternatives, as required by NEPA and NFMA, when revising its DBNF Forest Plan.  *See* 40 C.F.R. § 1502.14; 36 C.F.R. § 219.12(f)(5)(2000).  Specifically, Heartwood contends that during the public comment period, citizens presented the Forest Service with two "no logging alternatives." AR A9-A17, A24.  According to Heartwood, 94% of the public comments, either in

18

the form of letters or signatures on petitions, indicated a desire to end all commercial logging. *Id*. Consequently, Heartwood argues that the Forest Service violated NEPA and NFMA by failing to consider a "no logging alternative" in detail.

As a result of this public input requesting that no management take place on the Forest, the Forest Service developed Alternative B. AR A21b, A47, at 2-1, 2-2. Under Alternative B, there would be no human intervention in natural processes, public facilities would be closed and recreation, off-road vehicle use, and development of federally owned minerals on the Forest would cease. However, based upon some preliminary estimates on the impacts of Alternative B, the Forest Service concluded that Alternative B did not warrant further evaluation for two reasons. First, according to the Forest Service, Alternative B could not meet all of the legal requirements of NFMA, ESA, and the multiple-use and sustained yield requirements of the National Forest System lands. AR A21b, A47 at 2-2 to 2-4. For example, the Forest Service is required to "maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19 (2000). According to the Forest Service, "[t]here are a number of species that depend on ecological communities that can be maintained only by frequent levels of disturbance. . . [A] significant level of management is needed (at least over the next 10 to 50 years) to restore and maintain these disturbance-dependent communities. A certain amount of human intervention is needed to bring these communities into desired conditions of composition and structure." AR A19 at 26. Thus, the Forest Service contends that Alternative B's goal of "minimal human intervention" is inconsistent with the mandate to restore and maintain these disturbance-dependent communities upon which a number of species rely. AR A47, at 2-2 to 2-4.

19

Additionally, the Forest Service notes that Alternative B does not address "Forest Health," which was identified as an issue of public concern during the public comment period. Specifically, Alternative B does not take into account the Forest Service's goal of reducing the fuel overloads that render forests vulnerable to severe wildland fires or the forest's susceptibility to insect and disease outbreaks. AR A47.

Finally, the Forest Service determined that other alternatives, including Alternative B-1, which were being considered in detail provide for relatively low levels of management activities. Alternative B-1 provides that "[t]he natural interactions of organisms with each other and with their environment (ecological processes) would continue with a minimum of direct human influence. Characteristics of the Forest environment would be affected primarily by natural disturbances such as insects, disease, lightning-caused fire, and weather. . . Existing recreation facilities would continue to be managed and some additional primitive types of recreation opportunities would be created. No off-road vehicle trails or facilities would be provided. . . ." AR A47 at 2-5 to 2-10. According to the Forest Service, Alternative B-1 is essentially the same as Alternative B, with the addition of certain management activities necessary to bring certain ecological communities into desired conditions of composition and structure.

Thus, the issue before the Court is whether the Forest Service abused its discretion by failing to consider Alternative B, the "no logging alternative," in detail. NEPA requires agencies to "rigorously explore and objectively evaluate all reasonable alternatives" to a proposed plan of action that has significant environmental effects. 40 C.F.R. § 1502.14(a). NFMA regulations provide that the Forest Service "shall formulate a broad range of reasonable alternatives according to NEPA procedures." 36 C.F.R. § 219.12(f). The consideration of alternatives has been called "the heart"

20

of an EIS. *City of Carmel-by-the-Sea v. United States v. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). The range of alternatives "shall be distributed between the minimum resource potential and the maximum resource potential to reflect to the extent practicable the full range of major commodity and environmental resource uses and values that could be produced from the forest." 36 C.F.R. § 219.12(f)(1)(2000). However, an agency's consideration of alternatives is "bounded by some notion of feasibility." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 551 (1978). There is no requirement that an agency consider every conceivable alternative. *Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714, 718 (6th Cir. 1981). The level of specificity with which an EIS must examine alternatives is a matter of agency discretion, and should be overturned only if the range of alternatives is "so inadequate as to be an abuse of [the agency's] discretion." *Id.*

In this case, the Regional Forester considered a total of eight alternatives, including six in detail, for the DBNF's Revised Forest Plan. After a series of public workshops to gather additional public input and further refine the alternatives, two alternatives were eliminated from detailed study, including Alternative B. In its FEIS, the Forest Service fully explained its decision to drop Alternative B from further consideration, devoting two full pages to its rationale. AR A47 at 2-2 to 2-4.

To the extent that Heartwood contends that the Forest Service should not have eliminated Alternative B because it is the only "no logging" alternative, Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands. In fact, the Supreme Court has stated that it has never been the case that "the national forests were . . . to be 'set aside for non-use.'" *United States v. New Mexico*, 438 U.S. 696, 716 n.

21

23 (1978).  Rather, NFMA requires that plans developed for units of the National Forest System

"provide for multiple use and sustained yield of the products and services obtained therefrom . . . and

[must] include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and

wilderness[.]"  16 U.S.C. § 1604(e)(1).  Thus, NFMA clearly provides the Forest Service with the

authority to consider logging when revising its Forest Plan.

Thus, a complete review of the administrative record clearly reveals that the Forest Service

considered a sufficient range of alternatives.  The Forest Service did consider a "no logging

alternative," but declined to evaluate that alternative in detail.  The Regional Forester's decision

rejecting the "no logging alternative," as well as his consideration of the six alternatives studied  in

detail and his decision to select Alternative C-1 was not arbitrary or capricious, but rather supported

by the administrative record and fully explained.  Accordingly, Heartwood's motion for judgment

based on the Forest Service's alleged failure to consider a "no logging alternative" will be denied.

## C.   THE FOREST SERVICE TOOK THE REQUIRED "HARD LOOK" AT THE USE OF HERBICIDES

Next, Heartwood argues that the Forest Service failed to take the required "hard look" at the

use of herbicides when approving the Revised Forest Plan and the Ice Storm Recovery Project.  With

respect to the Revised Forest Plan, the Forest Service, in its EIS, deferred any analysis on the use of

herbicides to the site-specific level.  According to the Forest Service, any programmatic analysis

would have been speculative inasmuch as there was no concrete proposal at that time to use

herbicides.  The Court agrees.  Although NEPA would indeed require an analysis of the use of

herbicides, the Forest Service's obligation to conduct such analysis does not arise until the Forest

Service makes a *specific* decision to use herbicides.  As explained in *Ilioulaokalani Corp v. Rumsfeld*, 464 F.3d 1083,(9th Cir. 2006):

> When a programmatic EIS has already been prepared, we have held that site-specific impacts need not be fully evaluated until a "critical decision" has been made to act on site development.  This threshold is reached when, as a practical matter, the agency proposes to make an "irreversible and irretrievable commitment of the availability of resources" to a project at a particular site.

*Id*. at 1095-96(internal citations omitted in original).  In other words, NEPA "speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions."  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 20 (1976).  Consequently, despite Heartwood's argument to the contrary, the Forest Service is not required to conduct a speculative, forest-wide analysis on the cumulative effects of herbicides as a part of its NEPA analysis with respect to the Revised Forest Plan.

The Forest Service, however, has conducted an appropriate "hard look" analysis with respect to the site-specific use of herbicides in its Ice Storm Recovery Project.  The Forest Service explains that the 2003 ice storm created conditions favorable to the establishment and expansion of many species of non-native invasive plants.  The Storm Recovery Project proposes, *inter alia*, the control of non-native invasive plants on 1,000 acres by digging up and removing them or by selectively applying herbicides.  Specifically, the EA for the Ice Storm Project explained the use of herbicides as follows:

> In areas with large numbers of plants or areas where the plants were established prior to the ice storm, selective application of herbicide to plants would be used.  Treatment to control non-native invasive plants is expected on up to 1,000 acres over the next ten years.  Each site would require treatment at least two times.  Herbicide treatment would be expected to be necessary on at least 700 acres.  The herbicides

23

to be used would be glyphosate and triclopyr(ester).  The application method would be directed spray to target plants.  All areas identified for treatment will be surveyed for the presence of threatened, endangered, sensitive, or conservation species of plants prior to treatment.

AR B45a, at 1-3.

As part of its "hard look" responsibility, the Forest Service contracted with Syracuse Environmental Research Associates, Inc. ("SERA"), for a series of pesticide risk assessments.  AR B35, B37.  In addition to SERA's generic, or baseline, risk assessments, the Forest Service also utilized an interactive website to compute the risk of the particular herbicide for that particular project based upon relevant, site-specific data entered.  AR B33, B34.  As a result of these analyses, the DBNF Silviculturist and Ranger District Silviculturist concluded that the proposed use of the two herbicides did not present any significant risk to human health or the ecology of the DBNF.  AR B30.  Additionally, the Biological Opinion issued by FWS concluded that the application of herbicides in conjunction with the Ice Storm Recovery Project would not jeopardize the existence of the Indiana bat.  AR B44.

The EA discussed the effects of implementing the Ice Storm Recovery Project, including herbicides, on various resources including human health.  The EA further considered the cumulative effects of the use of herbicides in conjunction with the Ice Storm Recovery Project and two other projects ongoing in the project area.  AR B45a.

The Forest Service published the EA for public comment on November 11, 2004.  AR B45a-45q, B47-B50.  On February 2, 2006, the DBNF issued its FONSI and Decision Notice approving the Ice Storm Recovery Project.  AR B61.  Heartwood's appeal was ultimately denied by the Regional Forester on May 4, 2006.  AR B71, B74.

The administrative record clearly shows that the Forest Service took the requisite "hard look" at the use of herbicides in conjunction with the Ice Storm Recovery Project. The Forest Service Silviculturists concluded, after review of generalized and site specific analysis of the use of herbicides, that the use of herbicides did not present any significant risk to human health or the ecology. AR B30. Additionally, FWS concluded that the proposed use of herbicides was not likely to jeopardize the continued existence of the Indiana bat or any other threatened or endangered species. AR B44. Based on this record, the Court cannot find that the Forest Service acted arbitrarily or capriciously when reviewing the proposed use of herbicides in conjunction with the Ice Storm Recovery Project.

To the extent that Heartwood contends that the Forest Service failed to properly incorporate SERA's risk assessments into the record in accordance with the Forest Service NEPA Handbook, the Court also cannot find the Forest Service acted arbitrarily or capriciously. The Forest Service NEPA Handbook requires that in order for documents to be incorporated into the EA by reference, the documents must be referenced in the EA, include a brief summary of the material being incorporated, and be reasonably available for inspection by the public. Forest Service Handbook 1909.15 § 42.3, *citing* § 22.33. In this case, the EA clearly references the risk assessments, *see* AR B45a at 4-69, summarizes the material being incorporated in Table 4.12.1-1, *see* AR B54a at 4-69 to 4-70, and the legal notice soliciting comments on the EA and the letters sent to the public contain contact information for the public should additional information be desired, *see* AR B47, B49. Furthermore, the DBNF's responses to comments on the EA also noted the specialists' report on herbicides. AR B59 at 35-36. Accordingly, the risk assessments were properly incorporated by

reference into the EA.  For these reasons, Heartwood's motion for judgment based on the Forest Service's alleged failure to take a "hard look" at the use of herbicides will be denied.

### D.    THE FOREST SERVICE HAS FULLY COMPLIED WITH THE ESA

While Heartwood's various complaints assert up to four claims under the ESA, Heartwood submits in its reply brief that the only ESA claim on which it is proceeding is based on the Forest Service's alleged duty to reinitiate consultation with FWS based on the recent outbreaks of WNS. As explained above, an agency is only required to reinitiate consultation with FWS if one of the four factors set forth in 50 C.F.R. § 402.16 applies.  In this case, Heartwood points only to factor (b), which requires an agency to reinitiate if "new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(b).

In this case, Forest Service has determined that the new information - an outbreak of WNS in the Northeast and other states - does not trigger reinitiation of consultation with FWS.  The administrative record reveals that the Forest Service, FWS, and other agencies are currently monitoring the impact of WNS on bat species, including the Indiana bat.  AR A58 at 1; DE #68-2. Nothing in the record before the Forest Service, however, reveals any impact associated with WNS on the DBNF or within the Ice Storm Recovery Project.  In fact, the USFS reports a range wide increase of 10.0% in Indiana bat populations from 2005 to 2007.  AR A62.  Survey data from the Kentucky Division of Fish and Wildlife revealed no signs of WNS in 13,600 bats. AR A61. Moreover, the Forest Service's latest field survey in and around the project area found no Indiana bats.  AR B109 at 2.

Thus, while WNS continues to affect other national forests, there is no new information which shows any impacts on the Indiana bat in the DBNF that are greater than previously considered by the Forest Service. As the Ninth Circuit has stated, "[w]e do not hold that every modification of or uncertainty in a complex and lengthy project requires the agency to stop and reinitiate consultation." *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987). Rather, the Ninth Circuit concluded that reinitiation was required in that case only (1) because the expert agency, FWS, had requested reinitiation, and (2) because a land transfer upon which the biological opinion had relied had fallen apart. This land transfer was "the most important of many modifications the FWS considered absolutely necessary to insure that the project was not likely to jeopardize [bird species'] continued existence." *Id*.

While the Forest Service concedes that as of March 5, 2009, the presence of WNS has been confirmed in West Virginia and suspected in Virginia and New Hampshire, DE #68, this does not affect the reasoning underlying the Forest Service's decision not to reinitiate ESA consultation. There is no evidence that WNS is present in Kentucky, and cave-to-cave surveys throughout the DBNF found no trace of WNS. AR B83 at 1, AR A61. Furthermore, WNS is not present in Illinois, Ohio, Indiana, and Michigan, the states where Indiana bat banding data indicates migration to and from Kentucky has occurred. DE #68-2, ¶ 12. The presently-known impacts upon the Indiana bat fall short of the range wide decline that the FWS Biological Opinion established as a threshold for reinitiation. AR B44 at 66.

In addition, there is nothing in the record showing that the FWS has requested reinitiation or otherwise disagrees with the Forest Service's determination that the new information does not trigger reinitiation. Given its independent duty to request reinitiation when warranted, the FWS

27

presumably will speak up if conditions requiring reinitiation arise.  Accordingly, the Court concludes

that the Forest Service's explanation provides a rational basis for its decision not to reinitiate formal

consultation and is neither arbitrary nor capricious.  *Bowen*. 475 U.S. at 626, *see also Wyoming*

*Outdoor Council v. Bosworth*, 284 F.Supp.2d 81, 95 (D.D.C. 2003).   Accordingly, Heartwood's

motion for judgment for failure to reinitiate consultation under the ESA will be denied.

### E.     THE FOREST SERVICE DID NOT ILLEGALLY CHANGE THE ICE STORM PROJECT DECISION BY CLARIFYING ITS APPEAL DECISION

Heartwood's next argument relates to the administrative appeal of the Forest Service's

decision to proceed with the Ice Storm Recovery Project.  The Ice Storm Recovery Project Decision

Notice and FONSI was issued February 2, 2006.  AR B61.  Heartwood filed a timely administrative

appeal on March 20, 2006.  On May 4, 2006, the Regional Forester affirmed the February 2, 2006

decision to implement the Ice Storm Recovery Project, subject to an additional mitigation measure.

Specifically, the Regional Forester added this requirement:

> Tree felling may not occur between May 1 and July 31 each year, unless the sale area
> has been surveyed for the presence of Indiana bats according to standard protocols
> established by the U.S. Fish and Wildlife Service, and no bats are found.

AR B74 at 2.   This additional mitigation measure, according to the Regional Forester, was

necessitated by three factors: (1) the large-scale natural disturbance caused by the storm; (2) the fact

that all standing trees subject to felling in this project are suitable Indiana bat roost trees; and (3) the

period of greatest vulnerability for Indiana bats occurs during the time that females may be present

in roost trees with flightless young. AR B74 at 2.

On July 25, 2007, the Forest Supervisor wrote to the Regional Forester to ask for clarification

of the mitigation measure.   AR B76.  Specifically, the Forest Supervisor inquired whether the

28

mitigation measure applied to all Indiana bats, or only female Indiana bats and their young. In response, on August 16, 2007, the Regional Forester modified the mitigation measure to provide as follows:

> Tree felling may occur between May 1 and July 31 each year, provided the sale area has been surveyed for the presence of Indiana bats according to standard protocols established by the U.S. Fish and Wildlife Service, and no Indiana bats or only adult male Indiana bats are found.

AR B75.  Heartwood contends that the Forest Service's clarification of the mitigation measure improperly changed the appeal decision in contravention of the governing statute, the Forest Service Decision Making and Appeals Reform Act ("ARA"), Pub.L.102-381, § 322, 106 Stat. 1419 (1992) (codified at 16 U.S.C. § 1612 (note)).

The ARA requires the Forest Service to promulgate administrative regulations establishing notice, comment, and appeal procedures for "actions of the Forest Service concerning projects and activities implementing land resource management plans." Pub.L. 102-381, § 322(a).  Specifically, the statute provides for public notice of proposed actions, *id.* at § 322(b)(1); a 30-day comment period following publication of notice, *id*. at § 322(b)(2); a 45-day right of appeal for any person involved in the comment process, *id*. at § 322(c); and, except in an emergency, an automatic stay of the agency's action or decision for the 45-day period during which it can be appealed, *id*. at § 322(e).

Pursuant to the ARA, the Forest Service promulgated new procedural regulations implementing the ARA, codified at 36 C.F.R. Part 215.  According to the Supreme Court in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), these regulations are entitled to deference based on the Forest Service's subject matter expertise and its delegated role in implementing the congressional legislation.  *Id*. at 862-64.

29

Relevant to this case is 36 C.F.R. § 215.8(c), which provides as follows:

Issue a written appeal decision within 45 days following the end of the appeal-filing period, which affirms or reverses the Responsible Official's decision, either in whole or in part, and which may include instructions for further action.

36 C.F.R. § 215.8(c). Heartwood does not argue that the Forest Service was precluded from including the original mitigation measure; it does, however, take issue with the subsequent clarification of the mitigation measure to exclude male Indiana bats and the alleged failure to provide notice that a change had been made. Thus, the issue for the Court is whether the clarification was a change of the appellate decision, thereby invoking Heartwood's right for notice and to appeal under the regulations.

According to the Forest Service, the clarification was just that - a clarification. Since the purpose of the original mitigation measure, based on the Biological Opinion from FWS, was "to provide extra protection to female Indiana bats and their young," AR B76, the clarification was not a change in the appeal decision approving the Ice Storm Recovery Project. There is no evidence before the Court that the presence of male bats is indicative of a maternity colony. Inasmuch as the clarification is consistent with the intent of both the EA and Biological Opinion, as well as the mitigation measure, the Court cannot find that the Forest Service clarification amounts to a "change" in its decision, thereby invoking further notice requirements and appellate rights. Accordingly, Heartwood's motion for judgment based on the clarification to the appeal will be denied.

F.  **THE FOREST SERVICE HAS COMPLIED WITH RELEVANT SURVEY PROTOCOLS AND WITH THE ICE STORM RECOVERY PROJECT ITS**

In its final argument, Heartwood contends that the Forest Service's failure to comply with the FWS Indiana Bat Survey Guidance for the Commonwealth of Kentucky and with the Terms and

Conditions of the ITS requires the Forest Service to reinitiate consultation under Section 7 of the ESA or amounts to the "taking" of a species under Section 9 of the ESA.  Specifically, Heartwood points to one male Indiana bat that was captured during a 2007 survey.

On May 27, 2007, the FWS issued its Indiana Bat Survey Guidance for the Commonwealth of Kentucky.  AR B87.  The purpose of the Indiana Bat Survey Guidance is to: (1) improve the accuracy of the survey data and results; (2) use improved survey methodologies and technologies; and (3) provide survey protocols for potential hibernacula." AR B87 at 2.  The Appeal Decision on the Ice Storm Recovery Project, including the clarification, requires the Forest Service to comply with the FWS's Indiana Bat Survey Guidance.  The ITS also requires the Forest Service to monitor "skid and/or temporary haul roads in 10 percent of the 587 commercially treated units to determine whether Indiana bats are utilizing these roads as foraging and/or travel corridor habitats."  AR B44 at 64.  The Forest Service must coordinate survey plans with the FWS's Kentucky Field Office ("KFO").  *Id.*

The record reveals that the Forest Service has conferred with KFO and obtained the necessary approvals relating to the Forest Service's survey activity.  AR B106, AR B110 at 1-2.  Specifically, the Forest Service obtained a specific approval of its 2007 summer survey from FWS.  AR B97, B106, B108.  Moreover, the Forest Service performed surveys in two of five (or 40%) of the units where cutting has thus far occurred, and in four of seven (or 57%) of units where timber contracts have been awarded.  AR B110.  Thus, the Forest Service has clearly exceeded the 10% threshold established by the ITS.

Although one male Indiana bat was captured during a 2007 survey, the ITS provides the Forest Service with permission to take Indiana bats, provided that the level of take in the ITS is not

31

exceeded.  *See* 16 U.S.C. § 1536(o)(2)(stating that takes in compliance with an ITS "shall not be considered to be a prohibited taking").  In this case, only 7% of the incidental take amount has been used to date.  Accordingly, Heartwood's claim based on the ITS will be denied.

Heartwood also contends that the Forest Service failed to follow FWS's Indiana Bat Survey Guidance with respect to the length of time and number of nights acoustical sampling occurred. What Heartwood alleges, even if true, amounts only to minor deviations from FWS's guidance. Importantly, the Forest Service obtained approval of its survey methods from FWS.  AR B97, B106, B108.  As recognized by the Ninth Circuit in *Forest Guardians v. Johanns*, 450 F.3d 455, 465 (9th Cir. 2006), reinitiation was only required where monitoring was "materially inadequate" and results of surveys tended to indicate that the action was being substantially modified.  Specifically, the court stated, "[w]e do not hold that each isolated instance in which the Forest Service deviated from WaterCanyon's guidance criteria required the agency to re-initiate consultation."  *Id*.  In this case, FWS's approval of the Forest Service's survey methods is dispositive on this issue, and Heartwood's claim must fail.

**VI.    CONCLUSION**

For the reasons set forth above, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

(1)    the plaintiffs' motion for judgment reversing the administrative decisions [DE #49] is **DENIED**, and judgment will be contemporaneously entered in favor of the United States Forest Service;

(2)    the plaintiffs' motion for leave to file a Third Amended Complaint [DE # 51] is **GRANTED**, and the Clerk is directed to **FILE** the tendered Third Amended Complaint;

32

(3) the plaintiffs' motion to leave to file supplemental information [DE # 67] is **GRANTED**.

This April 27, 2009.



Signed By:

**_Karl S. Forester_** $KSF$

**United States Senior Judge**